United States District Court
Southern District of Texas
**ENTERED**
August 20, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BABAR JAVED BUTT, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. H-18-1176 |
| | § | |
| PATRICK FRANSEN, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, a federal prisoner at the time of filing,[1] filed this *pro se* lawsuit pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He names as defendants four agents of the Federal Bureau of Investigation ("FBI") – Patrick Fransen, Renee Cline, Robert Schumaker, and Brian Rasmussen – and two agents of the Department of Homeland Security ("DHS") – Paul Skinner and John Doe, Skinner's unnamed supervisor. Plaintiff seeks monetary damages along with reinstatement of his immigration bond and issuance of a specialized visa.

Based on consideration of the complaint, court records, and the applicable law, the Court **DISMISSES** this lawsuit for the reasons that follow.

---

[1] Plaintiff was released from federal prison on April 20, 2018, and is currently in pre-removal immigration detention.

## I.  BACKGROUND AND CLAIMS

A.    <u>Plaintiff's Prior Allegations</u>

On January 17, 2017, plaintiff pleaded guilty to six counts of federal mail fraud in *United States v. Butt*, C.A. No. H-16-452 (S.D. Tex.).  The district court imposed a 21-month sentence, three years' supervised release, and monetary restitution.  Removal proceedings in immigration court, initiated prior to his arrest, remained pending against plaintiff throughout his criminal prosecution.

During his plea hearing in the criminal case, plaintiff stated on the record that the following was a true statement of the facts underlying his federal offenses:

> If this case were to proceed to trial, the United States would prove each element of the offenses beyond a reasonable doubt.  The following facts, among others, would be offered to establish the Defendant's guilt as to Counts 1 through 6 of the indictment.  During the course of an investigation, FBI agents learned that Federal Express Corporation, hereinafter referred to as FedEx, which is a private commercial interstate and international mail carrier, had incurred significant losses on account of the Defendant's fraudulent activities.

> Specifically, the Defendant devised a scheme of establishing fraudulent customer accounts with the intent to permanently deprive FedEx of its revenue.  As part of his scheme, Butt would open FedEx accounts online using various names and addresses.

> In order to open a new account, Butt was required to include a credit card for purposes of payment.  He would ship packages under these accounts, and FedEx would bill for these shipments to the credit cards on file which were subsequently declined.

> The shipments were then invoiced to the addresses that were put on file by Mr. Butt; however, Mr. Butt failed to pay the shipping invoices thereby defrauding FedEx of its revenue for services rendered.

2

Specifically, on February 12, 2015, Mr. Butt opened FedEx Account Number 629487204 online under the name K Cellular Export with a billing address of 4200 Cypress Creek Parkway, Houston, Texas. This address is associated with the Defendant based on Immigration records as well as lease documents, Mr. Butt's car registration, and the articles of incorporation filed by Mr. Butt and used as the primary address for his business, BJB Trading, Inc.

Mr. Butt opened this account using credit card ending in 7716, an account which the Defendant knew was closed and/or had insufficient funds to cover the shipping charges incurred. Six shipments were made under this account as detailed in the plea agreement. On February 13th, there were two shipments; February 14, 2015; February 17, 2015; February 18, 2015; and another shipment on February 18, 2015.

FedEx attempted to charge the credit card on file for the amount of shipping invoices incurred as a result of these shipments. The credit card was declined on February 19, 2015. All invoices were returned unpaid. And at the time the account was cashed out, the unpaid invoices amounted to $10,214.77. This amount remains due and owing.

*Butt*, Docket Entry No. 106, pp. 9–11.

Plaintiff acknowledged in his written plea agreement that he understood the immigration consequences of his guilty plea, and that "by pleading guilty he may be removed from the United States, denied citizenship, and denied admission to the United States in the future." *Id.*, Docket Entry No. 18, p. 2. He further agreed to pay restitution in an amount not less than $287,679.00. *Id.*, p. 9. Plaintiff expressly waived the right to challenge, by direct appeal or in a collateral proceeding, the order of restitution issued by the Court. *Id.*, p. 10.

Plaintiff also stipulated to forfeiture of certain property. *Id.* He agreed that the factual basis for his guilty plea supported forfeiture of at least $287,679.00, and that a personal money judgment would be entered against him in that amount. *Id.* He expressly waived the

3

right to challenge the forfeiture in any manner, including by direct appeal or in a collateral proceeding. *Id.*, p. 11. He agreed that the written plea agreement constituted the entirety of their agreement, that no other promises or representations had been made by the Government, and that no threats had been made against him. *Id.*, pp. 11–12.

Plaintiff filed a sentencing memorandum with the district court prior to the sentencing hearing. *Butt*, Docket Entry No. 30 (sealed).[2] In the memorandum, plaintiff "request[ed] that the Court grant a variance from the sentencing guideline range because of his cooperation with the Government and supplying information in the investigation and potential prosecution of others," which he stated "expos[ed] him and his family to threats of violence." *Id.*, p. 1. Plaintiff argued that the district court had the authority to reduce his sentence if it found that he had provided cooperation to the Government in the investigation of others. *Id.* In short, plaintiff argued that the court could "recognize [his] cooperation and reward him for that assistance." *Id.*

Significantly, for purposes of the instant lawsuit, plaintiff set forth the following summarization of pre-arrest events in his sentencing memorandum:

> In April 2016, Mr. Butt was approached by various agencies who believed he was a money launderer and involved in a larger money laundering organization. *Mr. Butt agreed to cooperate with the government believing that*

---

[2]Although the sentencing memorandum was filed under seal in the criminal case, allegations pleaded by plaintiff in the instant lawsuit track many of the allegations appearing in his memorandum. Plaintiff did not file this civil lawsuit under seal. Moreover, to the extent plaintiff alleges facts in this lawsuit that contradict allegations he himself made during his criminal proceedings, the Court is of the opinion that he has waived any expectation of confidentiality or privacy as to those facts for purposes of this lawsuit.

> *cooperation would be rewarded by allowing him to regain viable immigration status permitting him to remain in the United States and also to avoid any prosecution.*
>
> *Mr. Butt agreed to searches of his property, consensual taping of his telephone conversations, and a complete debrief of his activities in the phone export business* and his knowledge of individuals and activities[.]. Mr. Butt provided information . . . both known and unknown to the government[.] Mr. Butt educated the government about a new means of committing fraud – credit profile numbers[.]
>
> *The agents, recognizing the need to keep Mr. Butt's arrest from becoming known* . . . established a cover story to call the arrest a traffic warrant arrest, understanding that had the criminals known the truth, then Mr. Butt would have become toxic to them and useless to the agents as a continuing source. *Text messages and tapes reveal the Defendant's continuing cooperation as an informant.*
>
> Ultimately, in a misguided effort to continue to provide substantial cooperation to the FBI agents and get the visa and non-prosecution he desired, *Mr. Butt resumed, without the knowledge or approval of his FBI handlers, the fraud he had earlier perpetrated against FedEx*, to provide to those crime figures visible proof that he was not the compromised rat they suspected he was.
>
> Mr. Butt was then arrested, detained, and lost the confidence of the government and the recommendation by the government of the 5K1.1 he had been working towards if indicted.

*Butt*, Docket Entry No. 30, pp. 3–4 (emphasis added) (sealed).

Plaintiff reported that, in May 2016, "people were believing that he was working for the FBI, and that such beliefs within the community *were damaging his credibility*." *Id.*, p. 26 (emphasis added). He reported instances of his sister and mother being followed and confronted in Pakistan by individuals who accused plaintiff of "cooperating" and demanding to know about his sentencing. *Id.*, pp. 26–27. Absent from the memorandum was any

mention of plaintiff himself being threatened or harassed by third parties.  Indeed, the only physical incident reported by plaintiff was that "someone had frisked him thinking he was a confidential informant."  *Id.*, p. 26.

It is clear from plaintiff's sentencing memorandum in his criminal case that he voluntarily agreed to cooperate with the federal agents, and that he did so as a matter of self-interest – he believed he could receive valuable benefits through his cooperation and efforts. He made a decision to cooperate with the defendants, and continued his cooperation despite being frightened by certain actions of the agents.  This is further supported by plaintiff's own words during allocution at his sentencing hearing:

> I'm truly sorry.  I just made the wrong decisions, Your Honor, and just – when I started helping the FBI, just kept messing up again and again, and I just wanted to save myself.  And I started doing things, which I should not have, behind Agent Cline's back, and I just felt cheated by the FBI.
>
> From the very first day when they arrested me, they let me go, and then in the night, when they came to my house, when I fully agreed with them that I'm going to fully cooperate with them, Homeland Security grabbed me by my arm and threatened me that they're going to chop me up into pieces.  That was the only reason why I . . . cleared my phone was the fact that [they] threatened me with violence, and I was very scared because I did not have an attorney.  And at that point I told the agents, "HEY, I'm getting an attorney."

*Id.*, p. 18 (original capitalization).

*    *    *    *

> Your Honor – Your Honor, my family is the direct victim *of my actions*, Your Honor.  Your Honor, my sister's marriage proposal was returned because they did not want to associate with a person who is a felon, Your Honor.

6

> Your Honor, my mother and my sister received death threats. I sent you letters
> [defense counsel] filed in my sentencing memorandum, like, all the incidents
> that happened with my sister and my mother where men came to my house
> threatening them . . . because they believe that I have cooperated with [the
> government].

*Id.*, p. 26 (emphasis added).[3] In short, plaintiff made clear through his criminal proceedings

that he had cooperated with the defendants voluntarily and strategically, that he lost the

defendants' trust by continuing his criminal activities behind their backs, and that his own

actions placed himself and his family at risk.

Plaintiff requested a variance in sentencing based on his cooperation with the

defendants. *Butt*, Docket Entry No. 50, pp. 13, 35–36, 37 (sealed). The district court

expressly relied on and accepted for sentencing purposes the allegations plaintiff made and

the legal positions he took in his sentencing memorandum and allocution regarding his

cooperation and attendant risks, and granted plaintiff a variance. *Butt*, Docket Entry No. 42,

p. 3 (sealed). The variance resulted in a lower sentence for plaintiff.

B.     Plaintiff's Current Allegations

In stark contrast to the facts plaintiff placed on the record in his criminal case are the

allegations he asserts in this *Bivens* lawsuit. Here, plaintiff paints a tale of being held for

hours if not days against his will by the federal agents, threatened and entrapped into

---

[3]The district court granted plaintiff's motion to unseal his written plea agreement. Plaintiff
had argued that "any interested persons" could review the unsealed agreement and see that it
contained no language "suggesting that the Defendant [was] cooperating with the Government and
providing information about other individuals in exchange for leniency." *Butt*, Docket Entry No.
24.

agreeing to work for them under "Operation Seven Eleven," and capitulating to their demands out of fear and panic. Plaintiff claims that he signed away his search and seizure and other rights on April 13, 2016, not in the spirit of cooperation to curry favor, but because DHS agent John Doe grabbed his arm and threatened to chop him into pieces then ship him back to Pakistan. (Docket Entry No. 1, pp. 3–4.) Although plaintiff claims the defendants' threats made him fear for his life, he admits that his immediate concerns after he signed the search consents that night were to move his business inventory out of his house and to another location, and to have his girlfriend take $91,267.00 in cash from the house. He states that "out of extreme panic," he then remotely wiped his cell phone clean, even though it was in possession of the federal agents. *Id.*, p. 4. According to plaintiff, the defendants blackmailed him into working with them.

Plaintiff claims that the next day, the defendants transported him to an FBI interrogation room, where he was "so mentally upset" that he forgot the name of the attorney he said he had just retained. The defendants berated him for wiping his cell phone. Plaintiff gave the agents additional search consents and told his girlfriend to hand over the $91,267.00 cash to a federal agent. Plaintiff asserts that, using fictitious warrants and consents obtained "under duress," the agents seized 452 electronics devices, the $91,267.00 cash, and other items from him. *Id.*, pp. 4–5.

Plaintiff further asserts that DHS agent defendant Skinner retaliated against him by arresting him as an out of status alien and initiating deportation proceedings, with warnings

not to retain an immigration attorney with a "South Asian background." Plaintiff allegedly remained in immigration detention from April 14, 2016, to May 5, 2016. On April 27, 2016, two federal prosecutors and defendants Fransen and Skinner held a proffer session with him. He agreed to work with the agents as an informant provided he receive security assurances. Although Skinner and John Doe purportedly contested plaintiff's request for an immigration bond, the immigration court released him on bond on May 5, 2016. *Id.*, pp. 5–6.

Following plaintiff's immigration release, defendants Fransen and Cline purportedly told him that, as an informant, he had to commit "reverse money laundering" by entrapping other victims with the FBI's "dirty money." Plaintiff declined, but they said his liberty depended on his obeying orders. Plaintiff complains that information about this and the earlier meeting were unlawfully withheld from *Brady* discovery during his criminal prosecution. According to plaintiff, FBI agent defendant Cline never took notes during their meetings, which violated *Brady* because no audio recordings were made. *Id.*, p. 7. He further complains that the FBI debriefing reports were transcribed but with misstatements and omissions, and that defendants Fransen and Cline refused to give him receipts for the electronics devices, cash, and other items they seized. *Id.*, pp. 6–7.

Plaintiff asserts that on June 6, 2016, defendants Schumaker and Cline searched his house without his consent, acting on a tip they received from FBI informant Ali Riaz that plaintiff had large sums of cash at his house. Plaintiff complained to Cline that Riaz was endangering his life and trying to discredit him. *Id.*, p. 6.

9

Plaintiff states that he was arrested in Houston on October 11, 2016, pursuant to a federal indictment in his criminal case. He complains that the defendants began interviewing people he knew, and that Cline disclosed to others that he was an FBI informant who had "named names." In ending the factual background portion of his lawsuit, plaintiff states that the defendants unsuccessfully tried to bribe him into signing an agreed deportation order and to pressure the federal district judge in his criminal case to sign an order of deportation. *Id.*, p. 7.

Plaintiff filed this *Bivens* lawsuit against the six federal agents involved in his criminal prosecution, claiming that they violated his First, Fourth, Fifth, Sixth, Eighth, and Thirteenth Amendment protections. He further claims that they conspired against him and are liable to him under a theory of "state-created danger." As resulting injuries for which he seeks monetary damages, plaintiff asserts

> several psychological, emotional and physical injuries and emotional distress arising out of those physical injuries, pain and suffering, mental aguish, inconvenience [*sic*], loss of capacity of enjoyment of life, inability to lead a normal life, shame, humiliation, and regress [*sic*]. These psychological, emotional, and physical injuries include erectile dysfunction, [excessive sweating], anxiety, high level of depression, hypertension, bi-polar disorder, paranoia, vision loss, aggravation of an existing physical defect, activation of a latent condition, schizophrenia and the fear of dying a painful death at the hands of the people on who claimant provided information on.

(Docket Entry No. 1, p. 2.)

Plaintiff seeks a declaratory judgment, damages, reinstatement of his immigration detention bond, and issuance of a "S" non-immigration status or a "U" visa.[4]

## II.  LEGAL STANDARDS

A.    *Bivens*

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that the violation of a person's Fourth Amendment rights by a federal official may give rise to an action for damages in federal court. *Bivens* is the counterpart to 42 U.S.C. § 1983, and it judicially extends the protections afforded under section 1983 to parties injured by federal actors. *Izen v. Catalina*, 398 F.3d 363, 367 n. 3 (5th Cir. 2005) (per curiam). Unless the defendant, sued in his individual capacity, has deprived a plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States, a plaintiff has no viable claim under *Bivens*.

In *Ziglar v. Abbassi*, ___ U.S. ____, 137 S. Ct. 1843, 1854–55 (2017), the Supreme Court discussed the three types of *Bivens* claims that have been recognized. First, in *Bivens* itself, the Supreme Court recognized an implied damages action to compensate persons injured by federal officers in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. Second, in *Davis v. Passman*, the Supreme Court recognized a *Bivens* remedy for a Fifth Amendment equal protection claim. 442 U.S. 228

---

[4]This Court has no jurisdiction to reinstate a bond that it did not issue or revoke, or to issue a "S" non-immigration status or a "U" visa. These remedies must be granted, if at all, by the appropriate immigration court.

11

(1979).  Third, in *Carlson v. Green*, the Supreme Court recognized a *Bivens* remedy for an Eight Amendment cruel and unusual punishment claim.  446 U.S. 14 (1980).

The *Abbassi* court noted that for over thirty years the Supreme Court has consistently refused to extend *Bivens* to new contexts.  137 S. Ct. at 1857.  A *Bivens* claim is new if it is "meaningfully different" from the previous Supreme Court *Bivens* cases.  *Id*. at 1859.  As stated by the Court, meaningful differences may include:  the rank of the officers involved; the constitutional right at issue; the extent of judicial guidance for the official conduct; the risk of disruptive intrusion by the judiciary into the functioning of other branches; or the presence of potential special factors not considered in previous *Bivens* cases.  *Id*. at 1860.  New *Bivens* claims should not be implied "if there are special factors counseling hesitation in the absence of affirmative action by Congress" or if there are alternative, existing processes for relief.  *Id*. at 1857.  "[T]he Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity."  *Id*.

B.    Dismissal Under 28 U.S.C. § 1915A

Although plaintiff is not proceeding *in forma pauperis* in this lawsuit, his pleadings remain subject to the screening provisions of 28 U.S.C. § 1915A.  Under that provision, the court must review a prisoner's complaint and dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief.

12

"A complaint is frivolous if it lacks an arguable basis in law or fact." *Black v. Warren*, 134 F.3d 732, 734 (5th Cir. 1998).  A complaint fails to state a claim if, "taking the plaintiff's allegations as true, it appears that no relief could be granted based on the plaintiff's alleged facts." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 240 (5th Cir. 1999).

To determine whether a prisoner's complaint fails to state a claim upon which relief may be granted, courts engage in the same analysis as when ruling on a motion for dismissal under Federal Rule of Civil Procedure 12(b)(6).  *Hale v. King*, 642 F.3d 492, 497–99 (5th Cir. 2011).

C.    Rule 12(b)(6) Standards

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).  To meet this pleading standard, the complaint must state more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

13

Furthermore, *pro se* pleadings as in the instant case are reviewed under a less stringent standard than those drafted by attorneys, and such pleadings are entitled to a liberal construction that includes all reasonable inferences that can be drawn from them. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). However, even a *pro se* complaint may not merely set forth conclusory allegations. The *pro se* litigant must still set forth facts giving rise to a claim on which relief may be granted. *Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993). Courts may not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

When proceeding under Rule 12(b)(6), courts generally consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). Because plaintiff in this case references matters and raises claims that intertwine with his criminal prosecution in *United States v. Butt*, C.A. No. H-16-452 (S.D. Tex.), the Court has taken judicial notice of those criminal pleadings and proceedings.

D.    Judicial Estoppel

Judicial estoppel is a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position elsewhere. *See Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988). The equitable doctrine serves "to protect the integrity of the judicial process, by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *In re Coastal Plains, Inc.*,

14

179 F.3d 197, 205 (5th Cir. 1999) (internal quotation marks, parentheses, and citation omitted).

Judicial estoppel has three elements: (1) the party against whom estoppel is sought has asserted a position plainly inconsistent with a prior position, (2) a court accepted the prior position, and (3) the party did not act inadvertently. *Allen v. C & H Distribs., L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015). Detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary, as judicial estoppel is meant to protect the judicial system, not the litigants. *See id.* In *New Hampshire v. Maine*, the Supreme Court observed that, "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." 532 U.S. 742, 750–51 (2001).

"Judicial estoppel is . . . applied in the court's discretion to prevent a party from asserting a position in a legal proceeding that is contrary to a position previously taken by [that party] in the same or some earlier legal proceeding." *United States v. Farrar*, 876 F.3d 702, 709 (5th Cir. 2017) (internal quotation marks omitted).

E.      *Heck* Bar

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that, in order to recover monetary damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a prisoner must show that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state

15

tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–487. The state inmate in *Heck* claimed that he had been unlawfully investigated, arrested, tried, and convicted. The Supreme Court held that section 1983 was not an available remedy because any award in the inmate's favor would "necessarily imply" the invalidity of his conviction. *Id.*

Although *Heck* was decided in context of a section 1983 lawsuit, its rule applies with equal force to *Bivens* claims. *Cardona v. United States*, 191 F. App'x 327, 328 (5th Cir. 2006) (dismissing a *Bivens* claim against federal prosecutors as barred by *Heck*); *see also Stephenson v. Reno*, 28 F.3d 26 (5th Cir. 1994).

## III. ANALYSIS

The Court has carefully reviewed plaintiff's pleadings and considered each of his stated claims. In light of his detailed narrative here, his allegations of record appearing in his criminal case, and the applicable law, the Court finds that plaintiff has clearly alleged his best case and that dismissal of his claims with prejudice is appropriate.

A detailed analysis of each of plaintiff's *Bivens* claims is set forth below.

A.     Official Capacity Claims

Plaintiff fails to state whether the defendants are being sued in their official or individual capacity. *Bivens* actions may be asserted against federal officials only in their individual capacity. *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282,

286 (5th Cir. 1999) (holding that *Bivens* "provides a cause of action only against government officers in their individual capacities").

To any extent plaintiff has sued the defendants in their official capacity, his *Bivens* claims are **DISMISSED WITH PREJUDICE**.

B.    First Amendment Claims

Plaintiff claims that, from April to October 2016, the defendants' threats, harassment, and intimidation prevented him from filing court proceedings seeking the return of his unlawfully seized property – the $91, 267.00 in cash and 452 electronics devices.  He further asserts that, after he pleaded guilty in the criminal case and sought recovery of the seized property, the defendants retaliated by cancelling his immigration bond on November 13, 2017.  Plaintiff alleges that these actions constituted violations of his First Amendment rights to free speech and to access the courts.

Neither the Supreme Court nor the Fifth Circuit Court of Appeals has directly extended *Bivens* to violations of the First Amendment.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment.").  This Court will not consider whether *Bivens* should be extended to cover plaintiff's claims here, because the facts as pleaded by plaintiff do not give rise to a viable First Amendment claim regarding free speech or access to the courts.

"[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."  *Bill Johnson's Restaurants, Inc. v.*

*NLRB*, 461 U.S. 731, 741 (1983); *see also Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993) ("Meaningful access to the courts is a fundamental constitutional right, grounded in the First Amendment right to petition and the Fifth and Fourteenth Amendment due process clauses") (quoting *Chrissy F. v. Mississippi Dep't Of Public Welfare*, 925 F.2d 844, 851 (5th Cir. 1991)).  As correctly argued by plaintiff, the First Amendment shields speech not only from direct limitations but also from adverse government action against individuals because of their speech.  *Colson v. Grohman,* 174 F.3d 498, 508 (5th Cir. 1999).

The record in plaintiff's criminal case shows that, on January 17, 2017, plaintiff pleaded guilty and, with counsel, signed a waiver of ownership as to the $91,267.00 cash. Plaintiff's counseled agreement to waive ownership to the funds in 2017 attenuated any First Amendment issues plaintiff may have had as to the property in 2016, and pretermits consideration of the claim he now seeks to raise.

Plaintiff's allegations and legal arguments as to his ownership of the electronics devices, on the other hand, vacillated dramatically during his criminal proceedings.  Plaintiff alleged at differing times that he owned, and never owned, the devices.  For instance, on October 16, 2017, plaintiff filed a *pro se* motion seeking return of the devices, expressly stating that the property was his. *Butt*, Docket Entry No. 45 (sealed).  When the Government subsequently filed a motion seeking forfeiture of the devices, plaintiff filed a *pro se* motion expressly *denying* that the property was his.  *Id.*, Docket Entry No. 56 (sealed).

18

In the instant lawsuit, plaintiff alleges that the devices were not his property. The Court accepts the allegation as true for purposes of 28 U.S.C. § 1915A and Rule 12(b)(6). Plaintiff's disavowment of ownership requires this Court to find that he had no legal right to seek recovery of the property during the April to October 2016 window. Consequently, any threats, harassment, or intimidation by the defendants not to seek recovery of the property did not result in a violation of his First Amendment rights vis-a-vis the property. Nor did the agents' inquiries into plaintiff's arrangements for paying his attorneys fees violate any First Amendment protections.

Plaintiff's sentencing memorandum clearly shows that it was not threats, harassment, or intimidation from the defendants that kept him from seeking recovery of any seized property. Rather, his conduct was motivated by his desire to cooperate with the defendants for his own benefit. As plaintiff unambiguously explained in his sentencing memorandum,

> Mr. Butt agreed to cooperate with the government believing that cooperation would be rewarded by allowing him to regain viable immigration status permitting him to remain in the United States and also to avoid any prosecution.

> Mr. Butt agreed to searches of his property, consensual taping of his telephone conversations, and a complete debrief of his activities[.]

*Butt*, Docket Entry No. 30, p. 3 (sealed). Consistent with his assertions of strategic cooperation aimed at obtaining leniency, plaintiff did not seek recovery of the property until three months after his guilty plea and sentencing. *Butt*, Docket Entry No. 45 (sealed). Indeed, plaintiff achieved his goal in that the district court accepted his assertions of

19

cooperation and personal risk and granted him a variance at sentencing. Under the doctrine

of judicial estoppel, plaintiff may not now be heard to contend that his actions were not ones

of voluntary and strategic cooperation and consent, but rather involuntary ones borne out of

fear, coercion, intimidation, and blackmail.

Further, his claims are barred by *Heck*. Forfeiture of the property was a specific part

of the written plea agreement, and became part of the judgment entered in his criminal case.

Any claim by plaintiff that the defendants wrongfully coerced him out of the property is

inextricably intertwined with his plea agreement, which has not been invalidated or otherwise

set aside. A judgment in plaintiff's favor under his First Amendment claims here would call

into question the validity of his written plea agreement and waiver of ownership agreement,

thus impinging on the validity of his conviction. Accordingly, his claim for monetary

damages is barred at this time by *Heck v. Humphrey*, 512 U.S. 477, 486 (1994).

Plaintiff's allegation that the defendants retaliated against him by initiating criminal

and immigration proceedings does not raise a right to relief above the speculative level. In

order to successfully plead retaliation, plaintiff must establish that (1) he exercised a specific

constitutional right, (2) defendants intended to retaliate against him for his exercise of that

right, (3) defendants undertook a retaliatory adverse act, and (4) causation. *See Bibbs v.

Early*, 541 F.3d 267, 270 (5th Cir. 2008). Plaintiff makes no such allegations. Additionally,

that the defendants retaliated against him *after* he filed his motions to recover seized property

is not a denial of access to courts or retaliation, as the conduct did not prevent or chill plaintiff's pursuit of litigation or prejudice him in the proceedings.

Regardless, plaintiff's own statements in his criminal proceedings rebut his assertions of retaliation brought here. Plaintiff admitted in his sentencing memorandum that he went behind the defendants' backs and continued his criminal activities, thus setting in motion his arrest and detention:

> Ultimately, in a misguided effort to continue to provide substantial cooperation to the FBI agents and get the visa and non-prosecution [I] desired, [I] resumed, without the knowledge or approval of [my] FBI handlers, the fraud [I] had earlier perpetrated against FedEx, to provide to those crime figures visible proof that [I] was not the compromised rat they suspected [I] was.

> [I] was then arrested, detained, and lost the confidence of the government and the recommendation by the government of the 5K1.1 [I] had been working towards if indicted.

*Butt*, Docket Entry No. 30, p. 4 (sealed). He further admitted at his sentencing hearing that his actions were a "betrayal of the government's trust," and that his strategy "backfired big time." *Butt*, Docket Entry No. 50, pp. 12, 13 (sealed).

Plaintiff fails to raise a viable claim for violation of his First Amendment rights, and the claims are **DISMISSED WITH PREJUDICE**. To the extent his claims are barred under *Heck*, his claims are **DISMISSED WITH PREJUDICE** until such time as the *Heck* conditions are met.

21

C.   Fourth Amendment Claims

Plaintiff claims that defendants violated his Fourth Amendment protections against unlawful searches and seizures by obtaining search consents via duress, coercion, threats, and blackmail; seizing his expired passports and papers; searching his residences on June 6, 2016, without his consent or a valid warrant; and intimidating and coercing him into answering questions during debriefing sessions.

In *Bivens*, the Supreme Court held that an individual whose right to freedom from unreasonable search and seizure is violated by federal agents has a private cause of action for damages against those agents.  403 U.S. at 396–97.  Plaintiff's factual allegations in the instant case, however, do not raise a viable claim for relief under the Fourth Amendment.

As is emphasized throughout this opinion, plaintiff acknowledged in his criminal proceedings that he voluntarily cooperated with the defendants, consented to their searches and seizures, and provided them with information in hopes of obtaining favorable treatment regarding his criminal and immigration proceedings.  The district court expressly accepted these allegations and granted plaintiff a variance, which resulted in his receiving a lower sentence.  Under the doctrine of judicial estoppel, plaintiff may not change tack at this juncture and now posit that his actions were coerced, his consents obtained by threat, and his information provided through intimidation and blackmail.

Plaintiff fails to raise a viable claim for relief under the Fourth Amendment, and his claims are **DISMISSED WITH PREJUDICE**.

22

D.     Fifth Amendment Claims

Plaintiff claims that the defendants denied him due process under the Fifth Amendment by waiting three or more months to give him written receipts for the property they seized from him. Plaintiff enjoyed no Fifth Amendment due process right to receive written receipts within a certain time frame, and no Fifth Amendment violation for purposes of *Bivens* is raised.

Plaintiff further complains that the defendants forced him to donate the seized electronics devices to charity. However, proceedings in his criminal prosecution and appeal show that the property has not been donated and that legal rights to the property presently remain in litigation. *Butt*, Docket Entry No. 50, pp. 42–43 (sealed); *United States v. Butt*, Appeal No. 18-20131, Entry #00514466446 (order staying disbursement and forfeiture activity pending appeal by third-party claimants). Nor did the defendants violate plaintiff's Fifth Amendment protections by attempting to obtain his agreement to donate the property. Regardless, plaintiff alleges in this lawsuit that the electronics devices never belonged to him; consequently, he cannot raise any constitutional claims as to unlawful seizure, depreciation, or disposition of the property in context of a Fifth Amendment *Bivens* action.

Moreover, plaintiff's alleged disagreements with certain language appearing in agency reports or transcripts, agency failures to audiotape certain meetings, and the defendants' unsuccessful efforts to "force" him or the criminal district court to sign a stipulated

deportation order at sentencing, do not state viable Fifth Amendment claims for purposes of *Bivens* as no cognizable procedural due process protections were denied.

His allegations of being promised and denied non-prosecution in exchange for his cooperation likewise fail to raise a viable Fifth Amendment due process violation. Plaintiff himself conceded in his sentencing memorandum and at his sentencing hearing that he went behind the defendants' backs and continued his criminal activities, thus setting in motion his arrest and detention:

> Ultimately, in a misguided effort to continue to provide substantial cooperation to the FBI agents and get the visa and non-prosecution [I] desired, [I] resumed, without the knowledge or approval of [my] FBI handlers, the fraud [I] had earlier perpetrated against FedEx, to provide to those crime figures visible proof that [I] was not the compromised rat they suspected [I] was.
>
> [I] was then arrested, detained, and lost the confidence of the government and the recommendation by the government of the 5K1.1 [I] had been working towards if indicted.

*Butt*, Docket Entry No. 30, p. 4 (sealed).

Plaintiff acknowledged at his sentencing hearing that his actions were a "betrayal of the government's trust," and that his strategy "backfired big time." *Butt*, Docket Entry No. 50, pp. 12, 13 (sealed). In short, plaintiff admitted that his own actions led to his ensuing arrest and detention.

Plaintiff also claims that the defendants violated his Fifth Amendment rights under *Brady* by failing to disclose exculpatory evidence during his criminal prosecution. His claim is not cognizable in context of a *Bivens* action. In *Brady v. Maryland*, 373 U.S. 83 (1963),

the Supreme Court announced a constitutional requirement addressed to the prosecution's pretrial conduct, and proscribed withholding evidence favorable to an accused and material to his guilt or to punishment. A successful *Brady* claim necessarily yields evidence undermining a conviction; *Brady* claims therefore rank within the traditional core of habeas corpus and are outside the province of section 1983 or *Bivens*. *Skinner v. Switzer*, 562 U.S. 521, 537 (2011). Such claims are also barred by *Heck*. *See also Boyd v. Biggers*, 31 F.3d 279, 283 (5th Cir. 1994) (finding a claim of withholding exculpatory evidence barred by *Heck* because, if proved, it would call the plaintiff's conviction into question under *Brady*.) Consequently, plaintiff's claims under *Brady* fall.

The Court notes that plaintiff's allegations here draw no clear distinction between procedural and substantive due process protections under the Fifth Amendment. The Court has construed his Fifth Amendment allegations as asserting procedural due process violations. To any extent plaintiff is alleging violations of his substantive due process rights, he fails to raise a viable claim for relief. In a substantive due process claim, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8 (1998). Such conduct must fail to "comport with traditional ideas of fair play and decency." *Id*. at 847. Examples of conduct that have been found to violate substantive due process include: the forced pumping of a suspect's stomach, *Rochin v. California*, 342 U.S. 165, 172–173 (1952); officers forcing a citizen "to travel at speeds

25

over 100 mph in their attempt to flee a terrorizing police officer," *Checki v. Webb*, 785 F.2d 534 (5th Cir. 1986); and a police officer who terrorized a mother and her two young children by screaming at them, trying to smash their windows with a nightstick and firing shots at their tires during a routine traffic stop. *Petta v. Rivera*, 143 F.3d 895, 897–903 (5th Cir. 1998).

Although plaintiff's allegations need not meet the extreme metric established by these cases above, his allegations remain well outside a viable substantive due process claim. At most, plaintiff's allegations show that, on April 13, 2016, defendant John Doe grabbed his arm and told him he would be chopped into pieces and shipped back to Pakistan. This occurred early on in his dealings with the defendants, and did not deter his decision to work with the federal agents in hopes of obtaining leniency in his criminal and immigration proceedings. Indeed, as plaintiff explained to the district court during his sentencing allocution,

> The only reason why I removed those items was because, in my own house, Homeland Security's grabbing my arm and telling me, "If you're not going to do anything that we tell you, we will chop you up into pieces and cut you" – "and ship you to Pakistan." But the very next day, when I hired an attorney, I gave everything back to them. That was – that was my way of saying, yes, I'm sorry for removing things from my house.
>
> Yes, I'm sorry for removing the money, but I gave everything back showing my commitment to working with them.

*Butt*, Docket Entry No. 50, p. 34 (sealed).

26

Nor does plaintiff raise a viable substantive due process claim in alleging that the defendants ultimately refused to provide him the anticipated leniency.  Plaintiff admitted in his sentencing memorandum and allocution that his own "misguided" efforts caused him to lose the defendants' trust and confidence as well as any advantages he may have otherwise garnered.  These and plaintiff's other allegations in his sentencing proceedings were accepted by the district court and ultimately resulted in his receiving a variance and lower sentence. Judicial estoppel precludes his efforts here to allege facts inconsistent with his earlier allegations.

Plaintiff fails to plead facts that could plausibly give rise to a reasonable inference that the defendants denied him substantive due process under the Fifth Amendment.

Plaintiff's Fifth Amendment claims are **DISMISSED WITH PREJUDICE** for failure to raise a viable claim for relief.  Plaintiff's *Brady*-based claims are **DISMISSED WITH PREJUDICE** until such time as the *Heck* conditions are met.

E.    Sixth Amendment Claims

Plaintiff claims that the defendants violated his Sixth Amendment rights by using another confidential informant to obtain incriminating statements against him, entrap him, and coerce him into working with the FBI.  He further complains he was told not to retain immigration counsel "from a South Asian background," and that the defendants inquired into any arrangements he made for paying his attorneys.

27

*Bivens* has yet to be extended to apply to Sixth Amendment claims, particularly in this context. Nevertheless, the Court finds it unnecessary to analyze any potential applicability, as no viable Sixth Amendment claim has been raised.

Plaintiff has no Sixth Amendment right to counsel as to his immigration proceedings. Congress provided that an alien has a right to obtain counsel at his own expense. *See* 8 U.S.C. § 1362. Consequently, any comment by the defendants regarding his potential choice of counsel for immigration purposes violated no established constitutional protection. Nor does plaintiff have a constitutionally protected right not to be asked about any payment arrangements he made with counsel.

Moreover, it has been well-established throughout this opinion that plaintiff's decision to cooperate with the federal agents was a voluntary decision founded on self interests, as established by his own pleadings and statements in his criminal proceedings. *Butt*, Docket Entry No. 30, p. 3 (sealed). Plaintiff is judicially estopped from raising assertions in this litigation that contradict his allegations of voluntary cooperation as were accepted by the district court in his criminal proceedings.

Plaintiff fails to raise a viable claim for violation of his Sixth Amendment rights, and the claims are **DISMISSED WITH PREJUDICE.**

F.    Eighth Amendment Claims

Plaintiff claims that the defendants inflicted cruel and unusual punishment on him by forcing him to donate the seized electronics devices to a charity. As discussed earlier, the

devices were not donated, and ownership rights to the devices remain the subject matter of on-going litigation on appeal. Moreover, plaintiff alleges in this lawsuit that he never owned the devices; consequently, any disposition of the devices would not impact his constitutional rights regarding the property.

Regardless, Eighth Amendment protections apply only in context of incarceration following a criminal conviction. *See Johnson v. City of Dallas*, 61 F.3d 442, 444 n. 5 (5th Cir. 1995) ("It is equally evident that the state does not incur Eighth Amendment liability even where injury occurs as the result of official conduct, unless the individual was being held in custody after criminal conviction."). Plaintiff's claims did not arise in context of incarceration following a criminal conviction.

Plaintiff's Eighth Amendment claims are **DISMISSED WITH PREJUDICE** as frivolous and for failure to raise a viable claim for relief.

G.     Thirteenth Amendment Claims

Plaintiff asserts that, "[b]y compelling and coercing [him] to work as an informant and serve federal agents under the threat of criminal sanctions, deportation, and withholding of immigration documents and preventing his seeking other immigration relief, the defendants violated his protections against involuntary servitude." (Docket Entry No. 1, p. 13.)

The Supreme Court addressed the scope of the Thirteenth Amendment in *United States v. Kozminski*:

> The Thirteenth Amendment declares that "[n]either slavery nor involuntary servitude, . . . shall exist within the United States, or any place subject to their jurisdiction." The primary purpose of the Amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase "involuntary servitude" was intended to extend "to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results."

487 U.S. 931, 942 (1988) (citations omitted). Plaintiff's allegations do not rise to the level of a violation of the Thirteenth Amendment.

Regardless, as addressed earlier in this opinion, plaintiff's allegations made in context of his sentencing proceedings make clear that he voluntarily agreed to cooperate with the federal agents, that he did so as a matter of self-interest in hoping to gain benefits or advantages, and that the district court ultimately accepted his allegations and granted him a sentencing variance. Plaintiff will not be heard to claim here that his cooperation with the federal agents was unlawfully coerced and involuntary.

Plaintiff's claims under the Thirteenth Amendment are **DISMISSED WITH PREJUDICE** as frivolous and for failure to state a viable claim for relief.

H.    "State-Created Danger" Liability

Plaintiff claims that the defendants placed his "life, liberty and freedom in danger by vindictively, rancorously and sinisterly revealing details about [his] involvement in Operation Seven Eleven as an informant to people who the FBI is actively investigating for other crimes." (Docket Entry No. 1, p. 9.) He argues that the defendants' conduct denied him substantive due process under a theory of "state-created danger" liability, as he and his family

30

in Pakistan have been threatened by other criminals or individuals who have a financial interest in his or their own criminal activities.

As explained by the Supreme Court, "the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression," and "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). The only recognized exceptions are the "special relationship exception" and the state-created danger theory. *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 855 (5th Cir. 2012). Plaintiff here relies upon the state-created danger theory, which renders the government liable "if it created or exacerbated the danger" of private violence. *Bustos v. Martini Club Inc.*, 599 F.3d 458, 466 (5th Cir. 2010).

The Fifth Circuit "has consistently refused to recognize a 'state-created danger' theory of § 1983 liability even where the question of the theory's viability has been squarely presented." *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004); *see also Paraza v. Sessions*, 680 F. App'x 345, 347 (5th Cir. 2017) (holding that alien raising state-created danger challenge to his removal order "failed to allege a valid constitutional challenge").[5]

---

[5]The Fifth Circuit momentarily adopted the state-created danger theory in *Breen v. Texas A & M University*, 485 F.3d 325, 338 (5th Cir. 2007), issued April 24, 2007. On July 26, 2007, it granted rehearing and withdrew those portions of the opinion that had adopted the theory. *Breen*, 494 F.3d 516 (5th Cir. 2007) (Mem).

Because this Circuit has not recognized the "state-created danger" theory of liability, Plaintiff's claims under that theory raise no constitutional issue for purposes of *Bivens*, and the claims are **DISMISSED WITH PREJUDICE**.

I.      Conspiracy Claims

Plaintiff alleges that, because the agents worked together in violating his constitutional rights, they are guilty of conspiracy.  To raise a conspiracy claim, a plaintiff must allege that the defendants agreed to commit an illegal act by identifying the illegal objective of the agreement and that a deprivation of constitutional rights occurred.  *Rodriguez v. Neeley*, 169 F.3d 220, 222 (5th Cir. 1999).  A plaintiff must plead a conspiracy claim with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one).

Because plaintiff has not raised a viable constitutional claim in this lawsuit, he cannot satisfy the requirement of showing that the deprivation of a constitutional right occurred as a result of a conspiracy.  Even had a viable constitutional claim been raised, plaintiff's conclusory allegation of a conspiracy does not allow the Court to draw the reasonable inference that the defendants conspired to violate his constitutional rights.

Plaintiff's conspiracy allegations raise no viable claim for relief under *Bivens*, and the claims are **DISMISSED WITH PREJUDICE**.

## IV.  CONCLUSION

For the reasons stated above, this lawsuit is **DISMISSED WITH PREJUDICE**.  Any and all pending motions are **DENIED AS MOOT**.

**SIGNED** at Houston, Texas on the 14th day of August, 2018.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

33